[Crim. No. 1777. Third Dist. Dec. 11, 1941.]

THE PEOPLE, Respondent, v. RAYMOND MITCHELL, Appellant.

Orr M. Chenoweth for Appellant.

Earl Warren, Attorney General, and J. Q. Brown, Deputy Attorney General, for Respondent.

THOMPSON, Acting P. J.—The defendant was convicted of murder of the second degree. On motion for a new trial,

the judge being doubtful of the sufficiency of the proof of malice, reduced the crime to that of manslaughter, and thereupon denied the motion. The defendant was sentenced to imprisonment in the state prison for the term prescribed for manslaughter. From that judgment this appeal was perfected.

It is contended the judgment is not supported by the evidence for the reason that the story which was related by James Wright, the chief witness for the prosecution, who is the only living eye witness of the affair, with the exception of the defendant, is inherently improbable and utterly unbelievable. Counsel for the defendant earnestly and vigorously declares his faith in the innocence of his client. We commend him for his able and conscientious defense. He was appointed to represent the defendant, who was without financial means to employ an attorney, and he has faithfully served without compensation.

We are, however, unable to agree with appellant's counsel that the prosecution's theory of the guilt of the defendant is inherently improbable. It appears that the defendant had a fair and an impartial trial in accordance with a liberal construction of the established rules of criminal procedure. The jury found him guilty of murder of the second degree and the trial judge, giving him the benefit of a doubt, reduced the crime to that of manslaughter. The testimony of the chief witness for the prosecution is corroborated by other reliable witnesses upon certain essential facts strongly indicating the guilt of the defendant. The defendant took the witness stand in his own behalf and there is an irreconcilable conflict of evidence upon the chief issues of the case. The credibility of the witnesses was a problem to be determined solely by the jury. Giving credence to the testimony of the prosecution's witnesses, the judgment is amply supported by the evidence.

The defendant and the deceased were itinerant workers who, for some time prior to the homicide, occupied an old abandoned box-car which was stationed on an unused timber railroad track near the town of Anderson in Shasta County. The car was entered by means of improvised steps leading to a side door. About one week before the homicide which occurred Friday night, January 24, 1941, these men were joined by James Wright, another migrant worker, who

had lived in that vicinity where he had engaged in spasmodic farm labor for several years. He had never previously met either the defendant, James Blair, or the deceased. The car was equipped with three temporary bunks and a makeshift stove. James Wright's bunk was at the extreme southerly end of the car. The bed occupied by the deceased was at the opposite end of the car. The defendant's bunk was stationed near the center of the car. The defendant and Mr. Wright were on good terms. The defendant had just been employed to perform some farm work for a resident in the vicinity of Anderson. He had agreed to share equally with Mr. Wright the work and wages. They discussed the details of that enterprise in the box car the night of the homicide. It had been raining that day. The evidence discloses no enmity between the deceased and Mr. Wright. The deceased was addicted to the excessive use of liquor. The defendant had previously severely criticised Blair on the ground that he was disorderly, drunken and filthy in his habits. The defendant disliked him on that account.

Mr. Wright spent a part of that day in the town of Anderson. He returned to the car about half past four in the afternoon, where he found the defendant and a junk man. The latter left soon afterward. The defendant and Wright prepared and ate their dinner, and then spent some time discussing their farming enterprise. About half past eight Wright removed his shoes and lay down upon his bed, soon falling asleep. The defendant remained in the car.

The deceased had been playing cards and drinking that day in a saloon in the town of Anderson, until after ten o'clock at night. There is some evidence that he became quarrelsome with the proprietor, but no witness stated that he was engaged in an affray with anyone. When he left the saloon he had a quart bottle of wine. There is no dispute over the foregoing statement of facts.

Mr. Wright testified that he was awakened by the "hollering" of Mr. Mitchell and by the disturbance which was going on in the car. Mitchell, who had a flashlight in his hand, was standing over James Blair who was lying on his bed at the opposite end of the car. He said Mitchell was "just kicking (the deceased) up here around the throat and in the head, around the head." He asked the defendant "What's the matter?" Mitchell replied "He had some trouble up

there with the officers and he came up and stumbled over me and broke my eggs. . . . He had a quart bottle full and he raised up to take a drink and I broke it over his head.'' Wright testified that Mitchell continued to kick the deceased ''with his right foot'' for about five minutes. He said the deceased just lay there groaning. Mitchell then moved his bed down toward the bunk occupied by Wright, and lay down upon it. For about fifteen minutes Blair lay in his bed moaning. Mitchell got up again and exhibiting an iron hook to Wright he said ''You see this? . . . I made this hook a week or so ago in order to rake his guts out of him.'' Wright said ''then he went back there and gave him another working over and at that time he kicked him down around the stomach more. . . . He (the defendant) just kept cussing and raving there.'' After another interval of time had elapsed, during which the deceased lay upon his bed groaning, Mitchell said ''I will fix that groaning,'' and he took a coffee can filled with water which he dashed in his face, after which the groaning ceased for a time.

When Wright was asked why he did not interfere with the beating of the deceased, he said, ''People on the road traveling around the way we travel around lets people take care of their own business.'' It is not unreasonable to believe that Wright feared to interfere with an angry, raving man who was armed with an iron hook.

About daylight Mitchell and Wright arose. Blair still lay upon his couch groaning. The defendant and Wright looked at him. His face was badly cut, bruised and bloody. Mitchell told Wright that Blair's face was bruised and bloody when he came into the car in the night time and fell over the stove breaking the eggs in the spider. The defendant said that Blair told him he had fallen on the railroad track on his way to the car and that he was injured in that manner. Mitchell said ''he had lots of influence there and he would fix this thing up.'' He washed the blood from the face of Blair with the use of some water and paper. Wright testified that Mitchell asked him to tell the folks in Anderson that Blair was hurt by falling out of the car door. The witness said that he refused to go to town with the defendant. Blair was apparently alive when Wright rolled up his blankets and left the car about eight o'clock that morning. Apparently he intended to get away from

anticipated trouble with the officers over the inhuman beating of Blair. He said that he walked down the road a quarter of a mile, and after thinking the matter over he said to himself, "I am going back and see that thing through." He got back to the stockyard and set his roll down under the shelter of a roof. It was then raining. Mr. King, the undersheriff, and Mr. Casebeer, the constable, came along and took him into custody. He was retained in custody as a witness for the prosecution until the time of the trial.

It appears that after Mr. Wright left the car on the morning following the attack upon James Blair, the defendant went up town and informed someone that there was a man in the box car who was "in bad condition" and needed medical aid. Doctor G. E. Flora and Constable Casebeer visited the car about eight or nine o'clock that morning and found the body of the deceased on his couch with a blanket spread over him to his chin. Near his head there were fragments of the broken bottle with which Wright said that Mitchell had struck him on the head. There were several bruises and lacerations on the face. On the forehead near the temple there was a cut through the flesh to the skull. Blood was upon his face and on the blanket. There was considerable blood on the floor of the car near his head, although there was evidence that his face had been washed with water and a dampened paper. The wet and bloody paper was found in the car. Blair was then dead. Mitchell, who was present, claimed to be surprised that Mr. Blair was dead.

Doctor Ernest Dozier made a post mortem examination of the body, and testified to the result of that investigation. He found several severe bruises and at least one laceration on the face and head of the deceased. There were numerous bruises on the chest and body. Six of his ribs were fractured. The eighth rib had punctured the liver. A large quantity of blood had seeped into the abdomen. The tissues about the fractured end of the eighth rib and surrounding the liver were badly lacerated. Doctor Dozier testified that it was his opinion from the macerated condition of the tissues that "somebody stood on him and teetered on him until his ribs were broken and his blood vessels opened and he bled to death." He said that Mr. Blair died as a result of the injuries to his chest and head, together with the shock which

followed the beating, tramping and kicking which he received. He also testified that the injuries to the chest, liver, ribs and face could not have been inflicted by merely falling on the railroad track or falling out of the car.

It will be recalled that Wright testified he saw the defendant violently kicking the deceased *with his right foot* on and about the face which was cut and bruised and which bled freely so that blood was found upon his face and in the vicinity of his head. Roger S. Green, chemist for the State Bureau of Criminal Identification, scientifically examined the right shoe, sock and cuff of the trousers of the defendant. He found upon each of them the presence of human blood.

We are of the opinion these corroborating circumstances strongly indicate that the story of Mr. Wright was substantially true, and that the defendant in the heat of passion beat, kicked and tramped him to death.

In a final brief the appellant earnestly insists the Attorney General has failed to answer his contention that two statements of the witness, Wright, conclusively show his testimony that the defendant kicked and stamped James Blair to death was false. These statements relied upon occurred as follows: On cross-examination Mr. Wright was asked if the defendant did not ask him to go up town with him to get a doctor, to which he replied: "You go after a doctor and I will go down to the pool room . . . and get the low-down on what kind of trouble Bruce (Blair) had last night." On cross-examination of the same witness he was asked if he did not say to the officers when they asked him if he and Mitchell were not friends, that he replied, "Yes, until he tried to place the blame on me."

The foregoing statements may be said to be inconsistent with Mr. Wright's testimony that he saw the defendant kick, stamp and beat the deceased. The credibility of the witness and the weight of his evidence were matters for the determination of the jury. They are expected to reconcile the testimony if possible. We must presume they attempted in good faith to do so. The witness may have been led into answering questions thoughtlessly. Wright had not testified on direct examination that the defendant had asked him to go up town with him *to see a doctor*. He did say the defendant "wanted me to wait around there and go up town with him."

It is true that the defendant and Wright had previously been friendly. According to the statement of Wright, the defendant exhibited a violent temper and brutally kicked and beat the deceased without cause. They had been acquainted only about a week. It is not unreasonable that Wright may have been in great fear of opposing the defendant and that he pretended he would assist him to falsely account for the injuries inflicted on the deceased. He said Mitchell told him Blair came into the car with a bruised and bloody face and that he said he was injured by falling on the railroad track. The defendant also told Wright that Blair said he had had "some trouble up there" with the officers. The last statement may have led Wright to use the excuse for not going up town with the defendant that he would inquire at the pool room to find out what trouble Blair had with the officers. Mitchell had asked Wright to falsely tell the people in town that Blair was injured by falling out of the car. Anticipating trouble over the affair and being anxious to get away, Wright may have said he would find out about the trouble with the officers as a mere excuse and to appease the defendant and lead him to think he intended to try and help him fasten the blame on someone else. Evidently he did not intend to do so. The weight of his evidence was for the determination of the jury. It is significant that the defendant became a witness in his own behalf and that he did not attempt to charge Wright with the crime. No one intimates that Wright was guilty of the crime as an accessory or otherwise. Wright, Mitchell and the deceased were the only ones in the car. If Mitchell did not cause the death of Blair by kicking and stamping him, we ask ourselves who accomplished that inhuman beating. There is no evidence of any previous affray in which the deceased was involved. In a small community every unusual transaction is likely to be known. Yet there was no evidence of anything in which the deceased was involved which could reasonably account for the condition in which he was found. The testimony of Wright is corroborated by the presence of human blood on the right shoe, sock and trouser leg of the defendant. Doctor Dozier testified positively that the deceased could not have broken six ribs and sustained the macerated and pulpy condition of the tissues and flesh about the broken end of the eighth rib which had punctured the liver, by merely falling on the railroad track.

He said it was evident someone had been teetering up and down on his chest. We are therefore of the opinion the statements relied upon do not conclusively show that Wright's testimony is inherently improbable.

It has been repeatedly held that a reviewing court should not reverse a judgment on the ground that the story of the prosecution's witness is inherently improbable unless it is so apparently false and unbelievable that reasonable minds may not differ in that regard. (*People* v. *Jefferson*, 31 Cal. App. (2d) 562 [88 Pac. (2d) 238] ; *People* v. *Lewis*, 18 Cal. App. 359, 364 [123 Pac. 232] ; *People* v. *Dunn*, 40 Cal. App. (2d) 6, 11 [104 Pac. (2d) 119] ; *People* v. *Stangler*, 18 Cal. (2d) 760 [117 Pac. (2d) 321].) We do not believe the story of James Wright was inherently improbable. It does not seem unreasonable. Both the jury and the trial judge believed it. The trial judge clearly indicated his belief in the defendant's guilt by denying a motion for new trial.

The judgment is affirmed.

Tuttle, J., concurred.